LIONEL Z. GLANCY, ESQ. #134180
PETER A. BINKOW, ESQ. #173848
MICHAEL GOLDBERG #188669
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Telecopier: (310) 201-9160

*Liaison Counsel for Plaintiffs*

JOSEPH STERNBERG
JONATHAN M. PLASSE
GOODKIND LABATON RUDOFF
& SUCHAROW LLP
100 Park Avenue
New York, New York 10017
Tel: (212) 907-0700
Telecopier: (212) 818-0477
jsternberg@glrslaw.com

*Co-Lead Counsel for Plaintiffs*

Additional Counsel Appear on Signature Page

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re SUPPORTSOFT, INC. SECURITIES LITIGATION,<br><br>This Document Relates to: All Actions. | **Master File No.: C 04-5222 SI**<br><br>**Hearing Date: July 15, 2005**<br>**Hearing Time: 9:00 a.m.**<br>**Courtroom 11**<br><br>**Before: Honorable Susan Illston** |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3)) ..... 1

INTRODUCTION ..... 1

Background ..... 1

The Allegations of the Complaint ..... 3

ARGUMENT ..... 3

I. THE COMPLAINT ALLEGES ACTIONABLE MATERIAL OMISSIONS AND MISSTATEMENTS ..... 3

A. The False and Misleading Statements were not Forward-Looking and are not Protected by the Private Securities Litigation Reform Act ..... 3

1. The "Safe Harbor" Does Not Protect an Entity or Person if the Speaker Knew That the Statement was False or Misleading ..... 5

2. Even If the Defendants' Statements Were Forward-Looking, They Could Not Have Been Protected by the Boilerplate Warnings to Which Defendants Point ..... 5

B. The Statements Complained of Were Material and Were Untrue at the Time They Were Made ..... 7

II. THE COMPLAINT ADEQUATELY ALLEGES THE OMITTED MATERIAL INFORMATION AND MATERIALLY FALSE INFORMATION AND THE SOURCES OF PLAINTIFFS' INFORMATION AND BELIEF ..... 8

A. The Underlying Facts Demonstrating That the Statements Were Materially False or Misleading and That Defendants Acted with Scienter are Adequately Supported ..... 9

1. Defendant Basu Has Admitted the Accuracy of the Allegations ..... 11

B. Defendants Failed to Disclose the Material Adverse Facts Alleged in the Complaint ..... 12

III. THE COMPLAINT ADEQUATELY PLEADS A STRONG INFERENCE OF SCIENTER OR DELIBERATE RECKLESSNESS ..... 14

A. The Allegations of the Complaint, Taken Together, Give Rise to a Strong Inference that the Defendants Acted with the Required State of Mind ..... 15

B. Taken in Conjunction with the Other Allegations of the Complaint and the Information Provided by Confidential Source No. 1, the Stock Sale Allegations Raise a Strong Inference of Scienter or Deliberate Recklessness ........ 17

IV. THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ........ 18

V. SINCE PLAINTIFFS' CLAIMS FOR VIOLATION OF EXCHANGE ACT § 10(b) ARE ADEQUATE, THE CONTROL PERSON CLAIM PURSUANT TO EXCHANGE ACT § 20(a) IS SUFFICIENTLY ALLEGED ........ 18

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re Apple Computer, Inc. Securities Litigation,*
243 F. Supp. 2d 1012 (N.D. Cal. 2002) ........ 7, 10

*In re Apple Computer Securities Litigation,*
886 F.2d 1109 (9th Cir. 1989), *cert. denied*, 496 U.S. 943, 110 S. Ct. 3229 (1990) ........ 8

*In re Copper Mountain Securities Litigation,*
311 F. Supp. 2d 857 (N.D. Cal. 2004) ........ 4, 8

*In re Daou Systems, Inc. Securities Litigation,*
397 F.3d 704 (9th Cir. 2005) ........ 10, 15, 17

*Dura Pharmaceuticals, Inc., v. Broudo,*
___U.S. ___, 125 S. Ct. 1627 (2005) ........ 18

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,*
353 F.3d 1125 (9th Cir. 2004) ........ 6

*Fecht v. Price Co.,*
70 F.3d 1078 (9th Cir. 1995), *cert. denied*, 517 u.s. 1136, 116 S. Ct. 1422 (1996) ........ 7, 14

*In re Intermune, Inc. Securities Litigation,*
No. C 03-2954 SI, 2004 WL 1737264 (N.D. Cal. July 30, 2004) ........ 8

*Livid Holdings Ltd. v. Salmon Smith Barney, Inc.,*
403 F.3d 1050 (9th Cir. 2005) ........ 4

*In re Metawave Communications Corp. Securities Litigation,*
298 F. Supp. 2d 1056 (W.D. Wash. 2003) ........ 10

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ........ 15, 17

*Nursing Home Pension Fund v. Oracle Corp.*,
242 F. Supp. 2d 671 (N.D. Cal. 2002) ........ 7-8

*In re PeopleSoft Inc.*,
99-00472 WHA, 2000 WL 1737936 (N.D. Cal. May 25, 2000) ........ 16

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996), *cert. denied*, 522 U.S. 808, 118 S. Ct. 48 (1997) ........ 6

*In re Ramp Networks, Inc. Securities Litigation*,
201 F. Supp. 2d 1051 (N.D. Cal. 2002) ........ 16

*In re Splash Technology Holdings, Inc. Securities Litigation*
[2000-2001 Tr. Binder], Fed. Sec. L. Rep. (CCH) ¶ 91,250 ........ 6

*TSC Industries, Inc. v. Northway, Inc.*,
426 U.S. 438, 96 S. Ct. 2126 (1976) .................... 7, 14

*In re Vantive Corp. Securities Litigation*,
283 F.3d 1079 (9th Cir. 2002) .................... 15

*Wenger v. Lumisys, Inc.*,
2 F. Supp. 2d 1231 (N.D. Cal. 1998) .................... 8

**STATUTES**

Securities Exchange Act of 1934
§ 10(b), 15 U.S.C. §78(j)(b) .................... 1, 18
§ 20(a), 15 U.S.C. § 78(t) .................... 1, 18

15 U.S.C. § 78u-5(c)(1)(A)(i) .................... 6

15 U.S.C. § 78u-5(c)(1)(B) .................... 5

## STATEMENT OF ISSUES TO BE DECIDED
## (Civil L.R. 7-4(a)(3))

1. Does the complaint adequately allege claims against defendants under Securities Exchange Act of 1934 § 10(b) and § 20(a)?

2. Can statements of historic and existing facts be characterized as forward-looking statements?

3. Are issues of materiality, what a reasonable investor would understand a partial or misleading disclosure to mean, and intent properly left to the trier of fact?

## INTRODUCTION

Plaintiffs' Memorandum of Points and Authorities is submitted in opposition to the defendants' motion to dismiss the consolidated class action complaint (the "complaint"). The complaint alleges violations of the Securities Exchange Act of 1934 (the "Exchange Act") by defendants SupportSoft, Inc. ("SupportSoft"), Radha R. Basu ("Basu"), the Chairman of the Board and Chief Executive Officer of SupportSoft and Brian M. Beattie ("Beattie"), SupportSoft's Chief Financial Officer and Executive Vice President of Finance and Administration during the class period beginning January 20, 2004 and ending on October 1, 2004. During the class period, defendants Basu and Beattie were the primary spokespersons for SupportSoft (complaint ¶¶ 15 and 18.)

**Background**

SupportSoft created and marketed software (complaint ¶ 26). It also arranged for the installation of the software and provided support services for the software. The software was, primarily, designed to allow users who maintained their own internal networks and suppliers of broadband and computer services to large numbers of subscribers to remotely analyze and attempt to correct problems being encountered by users and subscribers. During the class period, defendants were aware that suppliers of software and related information technology ("IT") products faced a tight market in which many customers were deferring software purchases or implementing more stringent approval processes that had the effect of delaying agreements to acquire software products and related services (complaint ¶ 43). Faced with a tight market for

software and IT services, tough competition, problems in adapting their products to the needs of some customers or in getting the software to perform the tasks needed by the customers, the defendants faced a corresponding difficulty in maintaining the growth in revenues and earnings that they had been touting as indicative of the success of the company (complaint ¶¶ 27-31, 33, 35, 41-43). In an effort to continue to be able to claim successive quarters of record revenues, the defendants determined to change SupportSoft's business model and to account for the overwhelming majority of new and renewed contracts so as to recognize revenue from the entire length of the contract in the quarter in which the contract was signed rather than each month as the payments were actually received (complaint ¶ 42).

The effect of this changed model resulted in moving revenue from future quarters in which it would otherwise have been recognized into the quarter in which the contract was signed. It allowed revenues in the current quarter to be artificially increased and enabled the defendants to proclaim yet another quarter of record revenues, even in the face of the slowdown in the market (complaint ¶ 42). The practice, however, acted like a pyramid scheme. In the absence of an ever increasing number of contracts and renewals for ever increasing amounts, a quarter would eventually come in which much of the revenue to be received during the quarter had already been recognized in earlier quarters, leaving a sharp reduction in revenues and a sudden end to the successive quarters of record results.

The defendants hid their strategic shift in business models from investors and the market for as long as possible – long enough for defendants Basu and Beattie to sell at least 490,000 of their own shares for personal proceeds of at least $5.3 million – before the lack of revenues caught up with SupportSoft and the stock dropped dramatically (complaint ¶ 13). When the lack of revenues hit, in the third quarter of 2004, SupportSoft's shares dropped from $9.62 per share to $6.21 per share, a drop of 35.4%, drifting even lower over the next ninety days, and investors like the plaintiffs were left holding the bag (complaint ¶¶ 45 and 49).

In moving to dismiss the complaint, the defendants claim to be uncertain of the nature of the omissions and misstatements complained of by plaintiffs. They mischaracterize the nature of the allegations of the complaint and attempt to excuse the omissions and misstatements as being

either forward-looking statements or immaterial. As demonstrated by the following points, the omissions and misstatements complained of are neither forward-looking nor immaterial and are adequately pled.

**<u>The Allegations of the Complaint</u>**

Although the complaint identifies the documents, their authors, the speakers, and quotes the language (complaint ¶¶ 28-35) that plaintiffs contend either omitted or misstated material facts and identifies (complaint ¶¶ 40-43) the materially false and misleading statements and why they were materially false and misleading, defendants' Memorandum of Points and Authorities ("Defendants' Memorandum") in support of the motion, in fn. 4 on p. 7, incorrectly suggests that "Plaintiffs failed to identify precisely the statements that they purport to challenge." Defendants then undertake to select portions of the statements complained of in the complaint and to address their motion to their selected portions of the false and misleading statements identified in paragraphs 28 through 35 of the complaint. Plaintiffs respectfully refer the Court to the allegations of omissions and misstatements alleged in the complaint, rather than to defendants' incomplete version of the complaint's allegations.

## <u>ARGUMENT</u>

### I. <u>THE COMPLAINT ALLEGES ACTIONABLE MATERIAL OMISSIONS AND MISSTATEMENTS</u>

#### A. <u>The False and Misleading Statements were not Forward-Looking and are not Protected by the Private Securities Litigation Reform Act</u>

Although some of the press releases and statements made by the defendants during conference calls with analysts certainly included forward-looking statements, none of the omissions or misstatements complained of were forward-looking. All of the omissions and misstatements complained of by plaintiffs relate to existing or current facts and, accordingly, are not subject to the safe harbor provisions of the Private Securities Litigation Reform Act ("PSLRA"). Representations and statements regarding the historic relationship of "ratable" revenues, which are recognized as they come in over a period of time, and "perpetual" revenues, which are recognized immediately, even though the payments will come in over a period of time, are not forward-looking. Neither are representations and statements regarding the way in which

SupportSoft executed prior contracts and customer satisfaction. Representations and statements regarding the company having, over the past ten quarters, joined an elite group of companies that have consistently delivered record results in difficult economic times are, also, not forward-looking. Similarly, representations and statements regarding the company's going forward with their "blended model" of "ratable" and "perpetual" contracts is not forward-looking when, as alleged in paragraph 42 of the complaint, the company had already determined to abandon that model and was converting "ratable" contracts to "perpetual" contracts in order to make revenue appear higher in current quarters. As explained in paragraph 42 of the complaint, the conversion of as many contracts as possible to "perpetual" revenue recognition distorted reported financial information. The result was to artificially inflate the apparent revenues and earnings in earlier quarters, thereby enabling the defendants to proclaim membership in an elite group of public software companies that had delivered 10 consecutive quarters of sequential growth in revenues and earnings. Undisclosed was defendants' knowledge that the shifting of revenue from future quarters when, using the "blended model," it would ordinarily have been recognized under the "ratable" system, to that earlier quarter would, in the future, lead to a reduction in reportable revenue. Nowhere did the defendants disclose that they were, in fact, abandoning that blended model in favor of pushing as many contracts as possible into an all "perpetual" model.

It may well be true that predictions of revenues or earnings per share for the coming quarter or the full year would constitute forward-looking statements and, if accompanied by adequate, specific cautionary language, qualify for the PSLRA's safe harbor, however, those are not the representations and statements complained of by plaintiffs. To the extent that defendants' statements rested upon a characterization of the present state of the company, such statements are not properly considered forward-looking. *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004); *Livid Holdings Ltd. v. Salmon Smith Barney, Inc.* 403 F.3d 1050, 1056-57 (9th Cir. 2005) ("extension of the bespeaks caution doctrine to statements of historical fact is inappropriate.")

**1. The "Safe Harbor" Does Not Protect an Entity or Person if the Speaker Knew That the Statement was False or Misleading**

As demonstrated above, the statements complained of were not truly forward-looking but, rather, were misstatements of existing facts. Even if the defendants were correct, however, in characterizing them as forward-looking statements, Exchange Act § 78u-5(c)(1)(B) protects against liability only if the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that the statement was false or misleading or, if made by an entity, was made by or with the approval of an executive officer of that entity and made or approved by such officer with actual knowledge that the statement was false or misleading. Here, each of the statements complained of was made by, or attributed by the company's press release to, either Radha R. Basu, the Chairman of the Board and Chief Executive Officer of SupportSoft or Brian M. Beattie, SupportSoft's Chief Financial Officer and Executive Vice President of Finance and Administration. Thus, the precise section of the PSLRA relied upon by the defendants provides that the defendants in this case will be protected only if the plaintiff is unable to prove that Basu and Beattie knew that the statement was false or misleading. The section does not provide for the dismissal of claims at the pleading stage merely because they are forward-looking. *Id.*

**2. Even If the Defendants' Statements Were Forward-Looking, They Could Not Have Been Protected by the Boilerplate Warnings to Which Defendants Point**

Even if the omissions and misstatements identified in the complaint were actually forward-looking rather than historic in nature, they would not have been protected forward-looking statements because the purportedly cautionary language was mere blanket or boilerplate warnings that failed to warn of the risks complained of. The moving papers are unable to point to any meaningful cautionary language warning readers or listeners that the statements complained of in the complaint should not be relied upon. The closest defendants are able to come is a quotation (at page 10 of their Memorandum) from page 16 of the Form 10-Q filed on May 10, 2004. Defendants have emphasized language to the effect that if orders expected to close toward the end of the quarter did not, in fact, close and, particularly, if those orders were for perpetual licenses, which are representing an increasing percentage of SupportSoft's revenue,

quarterly results would suffer. Nowhere, however, does the quoted language suggest that SupportSoft's business model had changed or that SupportSoft had begun converting as many orders as possible from ratable to perpetual licenses in order to recognize all revenue from the order in the quarter in which the order was received.[1]

Since even the defendants are unable to point to any meaningful cautionary language that addresses the misstatements and omissions complained of, defendants' assertion that they are entitled to the protection of the PSLRA's safe harbor provisions or to the "bespeaks caution" doctrine, from which the safe harbor was derived (*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co*., 353 F.3d 1125, 1132 (9th Cir. 2004)), would be without merit, even if the representations and statements complained of could be characterized as forward-looking rather than statements of historic fact.

The safe harbor provision is applicable only when the forward-looking statement is identified as such and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement 15 U.S.C. § 78u-5(c)(1)(A)(i). Boilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaninful cautionary warning. *In re Splash Technology Holdings, Inc. Sec. Litig.* [2000-2001 Tr. Binder] Fed. Sec. L. Rep. (CCH) ¶ 91,250 at p. 95,364 (N.D. Cal. Sept. 29, 2000) ("Merely including general cautionary language does not excuse a defendant's alleged omission of 'known material, adverse facts.'"); *Provenz v. Miller,* 102 F.3d 1478, 1493 (9th Cir. 1996), *cert. denied*, 522 U.S. 808, 118 S. Ct. 48 (1997) (cautionary statements must be precise and directly address the future projections, blanket warnings that securities involve a high risk are insufficient to ward against a

[1] Even if the Form 10-Q filed May 10, 2004 had contained meaningful cautionary language, it would, at best, suggests that, perhaps, a shorter class period might be appropriate. As demonstrated above, and as will be more fully demonstrated hereinafter, however, the cautionary language was inadequate and failed to disclose the real risks, *inter alia*, that the defendants had instituted a practice of converting contracts to "perpetual" revenue rather than "ratable" revenue in order to artificially inflate revenue figures for the quarter in which the order was received and proclaim record revenue for successive quarters, knowing that shifting the revenue from such contracts to the current quarter would reduce revenue in later quarters and, eventually, result in lower revenues for the quarter and end the string of successive increases.

federal securities fraud claim); *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002).

**B. The Statements Complained of Were Material and Were Untrue at the Time They Were Made**

In addition to contending that vague general statements should be accepted in place of the precise meaningful cautionary statements required by the safe harbor doctrine, the defendants also contend that their misstatements and omissions are not actionable because they were "immaterial."

The Ninth Circuit has noted that whether an omission is "material" is a determination that requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to that shareholder, and that such assessments are peculiarly ones for the trier of fact. *Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995), *cert. denied*, 517 U.S. 1136, 116 S. Ct. 1422 (1996) citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S. Ct. 2126, 2133 (1976).

Here, the defendants' statements regarding SupportSoft's "crisp execution," "leadership in service and support automation solutions," "leadership in technical service and support," "excellent results in spite of the difficult market conditions," entry into "an elite group of companies who have consistently delivered in difficult economic times" and comparable statements quoted in paragraphs 28 through 36 of the complaint cannot be characterized as "immaterial" as a matter of law.

Without specifying which of the statements made in SupportSoft's press releases and in conference calls with analysts, and complained of by plaintiffs were merely "puffery," defendants request that the Court hold that they were immaterial as a matter of law. Defendants' argument that certain of their misstatements are non-actionable because they were "mere puffery" is without merit. A statement that the defendants characterize as "puffery" is, nevertheless, actionable if the statement: (1) was not genuinely believed; (2) there was no reasonable foundation for the belief; or (3) the speaker was aware of undisclosed facts that tended to undermine the accuracy of the projection. *Nursing Home Pension Fund v. Oracle*

*Corp.*, 242 F. Supp. 2d 671, 679 – 80 (N.D. Cal. 2002); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989), *cert denied*, 496 U.S. 943, 110 S. Ct. 3229 (1990); *In re Intermune, Inc. Sec. Litig.*, No. C 03-2954 SI, 2004 WL 1737264 at *4 (N.D. Cal. July 30, 2004). The complaint certainly alleges that the speakers were aware of undisclosed facts that tended to undermine the accuracy of the statements that defendants contend are non-actionable because they were "mere puffery."

The cases cited by the defendants are not to the contrary. In support of their puffery argument, defendants rely upon *Wenger v. Lumisys, Inc.,* 2 F. Supp. 2d 1231 (N.D. Cal. 1998). In *Wenger*, however, the court noted that the plaintiff had argued that such statements would be actionable if the defendant knew them to be false. The court, however, also noted that the plaintiff had failed to allege that such statements were false, much less that any defendant knew them to be false. *Id.* at 1246. Here, the falsity of the statements, the basis upon which the complaint alleges their falsity and the knowledge of the defendants is alleged in paragraphs 40 through 43. Thus, defendants' reliance upon *Wenger* is unfounded. Moreover, citing *Fecht v. Price Co.*, the district court in *Wenger* held "only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Wenger* at 1239, *Fecht v. Price Co.*, 70 F.3d at 1081.

Defendants also purport to rely upon *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 868-869, however, the *Copper Mountain*, decision, like *Wenger*, cites *Fecht* and its caution that whether a statement in a public document is misleading may be determined as a matter of law only when reasonable minds could not disagree as to whether the mix of information in the document is misleading. *Copper Mountain*, 311 F. Supp. 2d at 881. Moreover, like *Wenger*, the court in *Copper Mountain* had concluded that the plaintiff failed to plead falsity with the requisite precision. *Copper Mountain*, 311 F. Supp. 2d at 883.

## II. THE COMPLAINT ADEQUATELY ALLEGES THE OMITTED MATERIAL INFORMATION AND MATERIALLY FALSE INFORMATION AND THE SOURCES OF PLAINTIFFS' INFORMATION AND BELIEF

Paragraphs 40 through 43 allege, with particularity, the material facts omitted from the statements complained of in paragraphs 28 through 35 as well as the materially false and

misleading information contained therein and why the statements were materially false or misleading. Defendants' suggestion, at pages 12-13 of their memorandum, that the complaint fails to specify the statements alleged to have been misleading and the reasons why the statement was misleading is without merit. Equally without merit is the suggestion that the complaint fails to allege that the defendants made the false or misleading statements either intentionally or with deliberate recklessness.

### A. The Underlying Facts Demonstrating That the Statements Were Materially False or Misleading and That Defendants Acted with Scienter are Adequately Supported

At page 13 of their memorandum, defendants refer to three of the underlying facts alleged in paragraphs 40 through 43 of the complaint that demonstrate that the statements quoted in paragraphs 28 through 35 omitted material facts or were materially misleading. Defendants also refer to the detailed allegations of paragraph 42 regarding the bolstering of apparent revenues through the defendants' conversion of as many contracts as possible to "perpetual" contracts in which the revenue to be received over the course of the contract was recognized immediately, even though a substantial portion of that revenue would not actually be received until later periods.

In addition to the other bases for the allegations, including the company's own press release of October 4, 2004, quoted in paragraph 44, the complaint discloses that the allegations are based upon information received from confidential sources. For example, paragraph 41 alleges the defendants' claims with respect to their "leadership in technical service and support," their "crisp execution," and customer-driven innovation were misleading because important customers, including Broadcom, Chase Manhattan and Blue Cross Blue Shield of Chicago were finding SupportSoft's products to be problematic and incapable of performing as promised. The paragraph specifically identifies the confidential source of the information as "a systems architect whose job was implementing software packages sold to customers by SupportSoft." The paragraph does not merely allege that the information came from a confidential source, it also identifies the position held by the confidential source, the problems being encountered by SupportSoft in carrying out contracts, and even identifies, by name, particular customers who

were dissatisfied, and had expressed such dissatisfaction, with SupportSoft's inability to fulfill the promised performance under their contracts and SupportSoft's loss of those contracts.

Paragraph 42 alleges the dramatic change in SupportSoft's business model that resulted from the defendants' switch from entering into a balanced number of "ratable" contracts, in which revenues were recognized monthly as they were received, and "perpetual" contracts, in which all of the revenue for the contract was recognized when the contract was entered into, to a system of pushing to have as many contracts as possible converted to "perpetual" contracts, so that the revenues could be recognized immediately. Paragraph 42 identifies one of the sources of the information as confidential source no. 3. It sets forth his position at SupportSoft as well as the information provided by confidential source no. 3 regarding the change in policy to convert as many contracts as possible to the immediate revenue method.

The defendants challenge these allegations as insufficiently detailed. Citing a decision from the Western District of Washington, *In re Metawave Communications Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D.Wash. 2003), defendants assert, at page 14 of their memorandum, that allegations regarding confidential sources must also allege the individual's dates of employment and other information. Defendants' assertion, however, is inconsistent with the decision in *In re Apple Computer Sec. Litig.*, 243 F. Supp. 2d 1012, 1027 (N.D. Cal. 2002) ("Unless other details about the identity of the CW are necessary to establish the CW's reliability, a job title will usually be an adequate description of a CW.") The recent decision by the Ninth Circuit in *In re Daou Systems, Inc. Sec. Litig.*, 397 F.3d 704, 712 (9th Cir. 2005) resolved any uncertainty. It does not mandate information such as dates of employment:

> "So long as plaintiffs reveal with particularity the sources of their information, the complaint will survive under the PSLRA. Naming sources is unnecessary so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." (Internal quotation marks omitted).

The Ninth Circuit noted that the plaintiffs in *Daou* had described the confidential witnesses with sufficient particularity by assigning a number to each witness and describing his or her job description and responsibilities. *Id.* *Daou* does not require the inclusion of dates of

employment for confidential sources. The complaint in the instant action complies with the requirements adopted by the Ninth Circuit in *Daou*.

**1. Defendant Basu Has Admitted the Accuracy of the Allegations**

Moreover, in explaining the reasons for the lower revenues in the third quarter of 2004, defendant Basu, in an October 20, 2004 conference call with analysts, admitted that the theretofore undisclosed change in business model had been responsible for reduced revenues in the third quarter:

> "What did lead to the miss in Q3? Our view is that some of the issues were in the quarter and some of them were issues from the year, which finally caught up with us.
>
> * * *
>
> Then we look at things that were developing over the year that we got caught on or manifested itself in Q3 strongly. We have been moving from a turn [*sic*, should be term] to a perpetual model. Some of it is because existing customers renewed their term licenses, especially the ones that were particularly happy with us, renewed them on a perpetual basis and have contributed to this. However, at a business model level this goes against the fundamentals of the company going back five years when we Pioneered the term 'License model' in the very early stages in — of the company, and emphasize the criticality of the models for carry forward for overall business visibility. This company has to get back to at least 50% of our business coming from the term model. We cannot have term licenses revenue go up and down. Now is the time to start rebuilding our term license revenue, the visibility, the backlog, everything that until Q3 was very strong going forward." Transcript of SupportSoft Q3 2004 Earnings Conference Call (Thomson StreetEvents, Oct. 20, 2004) at 2-3 (the "October 20, 2004 Transcript.") (A copy of the Oct. 20, 2004 Transcript is annexed as Exhibit A to the accompanying Declaration of Joseph Sternberg.)

Thus, it is not merely the plaintiffs' complaint and confidential source no. 3 alleging that there was a change in SupportSoft's business model in which "ratable" or "term" contracts were converted to "perpetual" contracts, with the revenue all recognized in the quarter in which the contract was entered, that resulted in the drop in revenues in the third quarter of 2004, the end of SupportSoft's consecutive record revenue quarters, and the resulting dramatic drop in the stock price and loss of confidence. Defendant Basu, speaking on behalf of the company after the

announcement of the reduced revenues and the drop in the stock price, admitted the accuracy of plaintiffs' allegations and confirmed the information provided by confidential source no. 3.[2]

### B. Defendants Failed to Disclose the Material Adverse Facts Alleged in the Complaint

Defendants argue that they made partial disclosures, or at least hinted at, some of the omitted facts alleged in the complaint. The moving papers, however, are unable to point to any sufficient disclosure prior to October 4, 2004 and, indeed, prior to the analyst conference call on October 20, 2004, regarding (i) SupportSoft's change in business model, (ii) the push to convert as many contracts as possible to "perpetual" contracts so as to enable SupportSoft to, immediately, recognize the revenue that was to be received over the entire term of the contract, raising the revenue for the quarter in which the contract was signed at the expense of future quarters, or (iii) the effect on revenues in future quarters of the change in policy to converting as many contracts as possible to perpetual contracts in order to immediately recognize the revenues. Instead, at pages 15-16 of their Memorandum, defendants point to Forms 10-K and 10-Q filed March 11 and May 10, 2004, respectively, which do not disclose the change in business model or policies but, rather, assert that the company has been entering into more perpetual licenses rather than term licenses as a result of "customers electing to purchase perpetual licenses" or "renew their licenses under a perpetual license basis." As Basu's admissions make clear, that claimed disclosure was neither accurate nor complete. It did not disclose the change in business model

---

[2] When defendants held the October 20, 2004 conference call for analysts to explain the reduced revenues in the third quarter results, Defendant Basu told the group that she wanted to return SupportSoft to a 50/50 split between "term" and "perpetual" licenses. (October 20, 2004 Transcript at p. 3). One analyst, Mark Verbeck, of Smith Barney, asked (October 20, 2004 Transcript at p. 10) how that could be done if, in fact, it was the customers who were selecting "perpetual" contracts. Ms. Basu simply responded that SupportSoft was "doing more and more I would say of term subscription model kind of deals…." and "even if the customers turn their original term licenses for high-speed data, install and support into perpetual when they buy new deals from us then we can make those term deals, and that's, in fact, some of the changes that we've already put together this quarter is to go back and be able to quote, those only as term deals." (October 20, 2005 Transcript at p. 10). Thus, the mix between "perpetual" and "ratable" or "term" licenses was clearly within SupportSoft's control. This further confirms what was indicated by confidential source no. 3 – that SupportSoft's earlier shift to "perpetual" licenses was a strategic choice by its management. It further illustrates the defendants' lack of candor in the language from SupportSoft's Form 10-K filed 3/11/04 quoted at page 15 of Defendant's Memorandum.

and it attributed the change to elections by customers. Neither did it truthfully discuss the effect on future results.[3]

The defendants never informed investors that SupportSoft had begun pushing to convert as many contracts as possible to the immediate revenue method, moving revenue that would otherwise be spread out over several reporting periods into the current period, which permitted SupportSoft to announce record revenue, but only at the expense of leaving less revenue to be reported in future quarters. Complaint, ¶ 42.

The complaint alleges that the defendants fundamentally changed their business *strategy*, deliberately trading long-term growth for short-term gain. The defendants do not claim, nor can they demonstrate, that these adverse facts were disclosed to the investing public. Indeed, the very language that the defendants cite in support of their argument misleadingly suggests that the shift from "ratable" to "perpetual" licenses was being driven entirely by SupportSoft's customers. SupportSoft's March 11, 2004 Form 10-K states: "The decrease in ratable license revenue is largely related to new *customers electing* to purchase perpetual licenses as well as existing customers … *choosing*, at or near the end of the initial term, to renew their licenses under a perpetual license basis." Defendants' Memorandum, at 15, quoting Def. Ex. B, p. 25 (emphasis added). The focus of the text is entirely on the customer's choice, rather than on SupportSoft's strategy.[4] The defendants made such statements throughout the class period. *See, e.g.,* SupportSoft Form 10-Q for the Quarter Ending March 31, 2004, Def. Exh. C, at 13 ("Over time, license revenue from ratable arrangements could decrease as a percentage of total revenue *as new customers are signing fewer* term license arrangements and *existing customers are renewing or converting term licenses* to a perpetual basis") (emphasis added); SupportSoft Form 10-Q for the Quarter Ending June 30, 2004, Def. Exh. D, at 14 (same). As these statements demonstrate, not only did the defendants fail to disclose their decision to pursue short-term gain

---

[3] Defendants' assertion (Defs.' Memorandum, p. 17) that the complaint fails to demonstrate that defendants' effort to convert "ratable" or "term" contracts to "perpetual" contracts was "done deliberately to disguise business difficulties" misstates the allegations of the complaint and misstates the law.

[4] See footnote 2.

in the form of perpetual licenses, they actively misled investors on this point. Thus, the defendants' deliberate effort to convert term to perpetual licenses, as set out in the complaint, reflected a significant strategic shift, as conceded by defendant Basu, by SupportSoft from the "fundamentals of the company going back five years." (October 20, 2005 Transcript at 2). The defendants did not disclose this fundamental change in their business plan, but rather concealed it.

Plaintiffs submit that statements regarding changes in the percentage of "ratable" and "perpetual" contracts attributing such variations to the desires of customers, is not adequate disclosure when, in fact, the changes are due to a change in the business model and concerted effort on the part of the issuer to convert as many contracts as possible to the "perpetual" model in order to, immediately, recognize revenue. Furthermore, a determination of what a reasonable investor would understand the disclosure to mean and whether such a disclosure accurately reflects what the defendants were doing, raises questions of fact for the jury. *See Fecht,* 70 F.3d at 1080 and *TSC Indus., Inc.*, 426 U.S. at 450.

## III. THE COMPLAINT ADEQUATELY PLEADS A STRONG INFERENCE OF SCIENTER OR DELIBERATE RECKLESSNESS

Continuing their mischaracterization of the complaint, defendants assert, at page 17 of their Memorandum, that the complaint fails to allege that the forecasts and forward-looking statements were false when made. As noted above, the omissions and misstatements complained of were not forward-looking and it is not the forecasts, themselves, that are the subject of the complaint, but rather the omission to disclose material changes in the business model and designation of contracts as being "perpetual" rather than "ratable," as well as the statements regarding SupportSoft's execution and ability to satisfy customers and that such performance put SupportSoft in an elite group that was not being affected by the same factors that were affecting other software companies, that form the basis of the complaint. As demonstrated above, plaintiffs have not only adequately alleged those omissions and misstatements, the explanation provided by defendant Basu on behalf of SupportSoft on October 20, 2004 confirmed the allegations regarding the change in the business model, SupportSoft's ability to determine

whether contracts would be accounted for as "ratable" or "perpetual" and the increased designation of contracts as "perpetual" that was a major factor in the reduction in revenues and earnings during the third quarter of 2004.

As defendants suggest, courts have recognized that falsity and scienter are generally strongly inferred from the same facts. *Daou Systems, Inc.*, 397 F.2d at 711; *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002). However, in contrast to the conclusion urged by the defendants in mischaracterizing the allegations of the complaint, the adequacy of the complaint in pleading the material omissions and misstatements assists in sufficiently pleading scienter.

### A. The Allegations of the Complaint, Taken Together, Give Rise to a Strong Inference that the Defendants Acted with the Required State of Mind

The complaint satisfies the requirement that it allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness. *Daou Systems*, 397 F.3d at 718. As the Ninth Circuit stated in *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004), and reiterated in *Daou*, the test is whether, even if individually lacking, the total of plaintiffs' allegations sufficiently create a strong inference that defendants acted with the required state of mind or with deliberate or conscious recklessness. 397 F.3d at 718.

As the defendants concede (defs.' memo, p. 18), paragraph 11 of the complaint alleges information obtained from confidential source no. 1, a sales executive at SupportSoft, that defendants Basu and Beattie kept a close watch on sales, participated in frequent meetings at which sales were analyzed and participated in all aspects of the Company and in all management decisions. Thus, the complaint alleges that Basu and Beattie were hands on managers who kept track of sales, attended sales meetings and were involved in all management decisions.

Paragraph 12 alleges that Basu, as Chairman of the Board and Chief Executive Officer, and Beattie, as Chief Financial Officer and Executive Vice President of Finance and Administration, operated and controlled the company, were aware that SupportSoft's customers were some of the same customers to which other software companies were selling, and that, to

the extent that other software companies were finding a slow down in software and IT purchasing that affected the software industry in general, many of those same industry factors would affect SupportSoft.

Paragraph 15 quotes an interview of defendant Beattie published in the *Wall Street Transcript* acknowledging that Beattie, defendant Basu and Scott Wilson, head of investor relations, were responsible for communicating what was happening at SupportSoft to the public. As indicated in paragraphs 28 through 35 of the complaint, it was Basu and Beattie who were quoted in, and provided the information for, SupportSoft's press releases and conducted the conference calls with analysts. *See also, In re PeopleSoft, Inc. Sec. Litig.*, No. C 99-00472 WHA, 2000 WL 1737936 at, *3 (N.D. Cal. May 25, 2000) (CEO and CFO must be presumed to know "facts critical to a business's core operations or an important transaction"); *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1076 (N.D. Cal. 2002) (same). Defendants cannot dispute that it was Basu and Beattie who were familiar with SupportSoft's operations, business, sales, revenues and earnings. They had the knowledge and they were the company spokespersons.

Moreover, not only did they have the knowledge and present it on behalf of SupportSoft, paragraphs 28 through 39 allege a pattern of defendants' positive statements resulting in bump-ups in the price of SupportSoft's shares followed by insider selling by defendants Basu and Beattie during the class period. Indeed, paragraph 13 alleges that, during the class period, defendants Basu and Beattie sold at least 490,000 of their shares of SupportSoft stock for personal proceeds of at least $5.3 million. By selling such shares after favorable press releases and analyst conference calls during the class period, defendants Basu and Beattie were able to sell their shares at prices ranging from $8.13 to $13 per share. As alleged in paragraphs 45 and 49, once the reduction in revenues and earnings for the third quarter were disclosed, SupportSoft's stock dropped to $6.21 per share and, over the next 90 days, averaged $5.76 per share. Defendants Basu and Beattie profited greatly by selling a substantial number of SupportSoft shares immediately following their positive statements and before the drop in prices following the disclosure of reduced revenues caused by the use of "perpetual" contracts to shift

the recognition of revenue into earlier quarters, and by the slow down in software and IT sales, that defendants' earlier statements were designed to suggest were not affecting SupportSoft.

**B. Taken in Conjunction with the Other Allegations of the Complaint and the Information Provided by Confidential Source No. 1, the Stock Sale Allegations Raise a Strong Inference of Scienter or Deliberate Recklessness**

Discussing the suspicious stock sales in a vacuum, defendants argue that plaintiffs are relying exclusively on "motive and opportunity" allegations to plead scienter. As demonstrated above, the suspicious stock sales constitute only one of the indicia of scienter alleged by plaintiffs.[5]

Although the moving papers assert that the complaint's allegations of suspicious sales and timing do not include the percentage of shares sold by the defendants or information regarding the defendants' trading history, the discussion of that information in defendants' papers does not refute the fact that the defendants sold large numbers of shares following their positive statements and prior to the truth becoming known. Defendants in securities actions sometimes assert that the suspicious sales represented only a portion of the insider's shares or that the insider had also sold shares prior to the class period, however, the sales information provided in the moving papers does not, in any way, dispute the allegations of the complaint and, in some respects, depends upon shortening the class period in order to artificially exclude some of the sales alleged in the complaint.

As noted above, in *Nursing Home* and *Daou Systems*, the Ninth Circuit held that, in determining whether the complaint sufficiently alleges a strong inference that a defendant acted with the required state of mind or with deliberate or conscious recklessness, the court must consider whether the total of plaintiffs' allegations, even if individually lacking, are sufficient to create the strong inference. 397 F.3d at 718. When the suspicious stock sales are considered together with the additional allegations regarding the knowledge of the defendants, their hands

[5] In the recent *Daou Systems* decision, the Ninth Circuit noted that its affirmance of the dismissal as to one director who was not involved in the day-to-day operations of Daou "does not imply that suspicious stock sales, by themselves, can never lead to a strong inference." 397 F.3d at 721. *Daou Systems* further holds that the PSLRA neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but merely requires that the evidence meet the strong inference standard. *Id*. at 719.

on management, their positions as spokespersons for SupportSoft, and consistent knowledge of, and reporting of, the operations of SupportSoft, its revenues, earnings, etc., and the information provided by confidential source no. 1, the complaint, taken as a whole, adequately alleges scienter.

## IV. THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Also without merit is defendants' argument that the complaint fails to allege loss causation. Defendants direct the Court's attention to paragraph 47, which alleges transaction causation and that plaintiffs and the members of the class were damaged, as well as to paragraph 61, which, also, alleges that plaintiffs and the class were damaged. Inexplicably, defendants fail to discuss paragraph 49 of the complaint, which alleges the drop in the price of the shares following the disclosure of the omitted facts and misstatements on October 4, 2004. Neither do defendants discuss paragraphs 44 and 45, which allege the disclosure of the truth on October 4, 2004 and, in paragraph 45, the resulting price drop. Since the complaint adequately alleges loss causation and satisfies the requirements of *Dura Pharmaceuticals, Inc., v. Broudo*, ___ U.S. ___, 125 S. Ct. 1627 (2005), defendants' assertion that the complaint fails to adequately allege loss causation is totally without merit.

## V. SINCE PLAINTIFFS' CLAIMS FOR VIOLATION OF EXCHANGE ACT § 10(b) ARE ADEQUATE, THE CONTROL PERSON CLAIM PURSUANT TO EXCHANGE ACT § 20(a) IS SUFFICIENTLY ALLEGED

Defendants discuss plaintiffs' claim for violation of Exchange Act § 20(a), imposing liability on controlling persons, only in footnote 18 on page 21 of their memorandum. Defendants' discussion is limited to a contention that, because they assert that the complaint fails to adequately allege liability under Exchange Act § 10(b), there can be no liability under Exchange Act § 20(a). As demonstrated by the foregoing, however, plaintiffs' claims for violation of Exchange Act § 10(b) are adequately alleged. Accordingly, defendants have offered no basis for dismissing the additional claim for controlling person liability under Exchange Act § 20(a). Since the § 20(a) claim is properly alleged, it should not be dismissed.

## CONCLUSION

As demonstrated by the foregoing, plaintiffs' complaint is sufficiently alleged. Accordingly, defendants' motion to dismiss should, in all respects, be denied. In the event, however, that the Court, for any reason, finds the complaint to be insufficient in any respect, plaintiffs respectfully request leave to replead.

Dated: June 20, 2005

Respectfully submitted,

**GOODKIND LABATON RUDOFF & SUCHAROW LLP**

By: s/ Joseph Sternberg
Joseph Sternberg
Admitted *Pro Hac Vice*
100 Park Avenue
New York, New York 10017
Telephone: (212) 907-0700
Telecopier: (212) 818-0477

**SCHATZ & NOBEL, P.C.**
Andrew M. Schatz
Jeffrey S. Nobel
Mark P. Kindall
20 Church Street
Hartford, Connecticut 06103
Telephone: (860) 493-6292
Telecopier: (860) 493-6290

*Co-Lead Counsel for Plaintiffs*

**GLANCY BINKOW & GOLDBERG LLP**
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Telecopier: (310) 201-9160

*Liaison Counsel for Plaintiffs*