1
2
3                                                              E-Filing
4
5              IN THE UNITED STATES DISTRICT COURT
6            FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8   In re SUPPORTSOFT, INC. SECURITIES          No. C 04-5222 SI
9   LITIGATION
                                          /     **ORDER   DENYING   DEFENDANTS'**
10                                              **MOTION TO DISMISS**
    This Document Relates to All Actions
11
                                          /
12
13          On November 18, 2005, the Court heard oral argument on defendants' motion to dismiss
14   plaintiffs' amended complaint.  Having carefully considered the arguments of the parties, the Court
15   DENIES defendants' motion.
16
17                              **BACKGROUND**[1]
18          This is a securities class action against SupportSoft, Inc., a Delaware corporation, and Radha R.
19   Basu and Brian M. Beattie, two of the company's senior officers.[2]  SupportSoft is a "provider of real-
20   time service management software designed to accelerate and automate enterprise technical support,
21   customer service and IT infrastructure management."  Amended Compl. ¶ 18.
22          On October 4, 2004, SupportSoft announced its preliminary financial results for the third quarter
23   of 2004.  *Id.* at ¶ 72.  Although the company had previously announced that it expected total revenues
24   to be approximately $17 million, it failed to meet this guidance.  *Id.* at ¶ 28.  The company's estimates
25

---

26   [1]In their motion, defendants request that the Court take judicial notice of plaintiffs' SEC filings
     that are not referenced in the amended complaint.  The Court GRANTS this request.  *See In re Calpine
27   Corp.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003).

28   [2]Basu is the Chairman of the Board and Chief Executive Officer of SupportSoft.  Amended
     Compl. ¶ 9.  Beattie is its Chief Financial Officer.  *Id.* at ¶ 10.

of total revenues for the quarter were between $11.9 million and $12.3 million, a $5 million shortfall that was even lower than the $13.5 million in revenue that SupportSoft recognized in the third quarter of the previous year. *Id.* at ¶¶ 28, 72.  On this news, "the Company's share price dropped from $9.62 per share to $6.21 per share, representing a drop of 35.4% on extremely heavy trading volume." *Id.* at ¶ 73.

On August 23, 2005, plaintiffs filed an amended class action complaint against defendants, alleging that defendants had committed securities fraud in violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act").[3]  The proposed class consists of all those who purchased or otherwise acquired SupportSoft stock between January 20, 2004, and October 1, 2004.

Plaintiffs' amended complaint alleges that defendants made a number of false and misleading statements in press releases and conference calls, both before and during the class period.  Plaintiffs allege that these statement and omissions were deliberately made to conceal problems that were appearing in SupportSoft's business and to artificially inflate SupportSoft's stock price.

The core of plaintiffs' allegations is that, before and during the class period, defendants were experiencing a slowing business environment.  To mask the fact that defendants' business was generating less revenue than expected, defendants decided to increase SupportSoft's present revenue by cannibalizing its future revenue stream.  Plaintiffs allege that defendants achieved this goal by encouraging customers to switch from "ratable" software licenses -- under which the licensee makes a series of payments over a fixed term -- to "perpetual" software licenses -- under which the licensee makes one lump-sum payment in exchange for the right to use the software perpetually.  A perpetual license allowed SupportSoft to recognize immediately as revenue the entire value of a contract, while revenue under a ratable license had to be recognized in the period in which it was paid.[4]  Thus, switching existing

---

[3]Plaintiffs filed their original class action complaint against defendants on April 20, 2005.  In an order filed on July 18, 2005, the Court dismissed that complaint without prejudice for failure to comply with the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995.

[4]According to plaintiffs' amended complaint:

. . . SupportSoft licensed its software under both "term" and "perpetual" licenses.  The

2

customers from ratable to perpetual licenses would have the effect of significantly increasing present revenue at the expense of future revenue.

Plaintiffs argue that statements in defendants' bullish press releases and conference calls from October 16, 2003, January 20, 2004, April 19, 2004, and July 20, 2004, were all misleading because they failed to disclose the slowing business environment and the contract-conversion techniques defendants used to try to mask that environment. Specifically, plaintiffs claim that defendants' press releases failed to disclose that:

> 1) its business model was in fact not materially different from other enterprise software companies;
>
> 2) its customers were implementing additional hurdles to contract approval;
>
> 3) licensing sales were slowing;
>
> 4) the Company was experiencing execution difficulties;
>
> 5) the defendants had changed SupportSoft's business model from one in which at least half the software licensing contracts into which SupportSoft entered were accounted for as producing revenue ratably over the entire term of the contract to one in which nearly all licensing contracts were accounted for as producing revenue for the entire contract immediately so as to make revenue figures appear higher in the current quarter at the expense of later quarters;
>
> 6) the defendants were directing SupportSoft employees to convert previously entered ratable contracts to contracts for which the revenue could be booked immediately in order to artificially make the current quarter's revenue appear higher at the expense of later quarters;
>
> 7) in the first and second quarters of 2004, defendants converted nearly all remaining ratable contracts with existing customers to artificially make it appear that SupportSoft had met its revenue projections even though its business had slowed and revenues would otherwise have been flat or fallen in the first and second quarters of 2004; and
>
> 8) the outlook for the third quarter of 2004 should have been for reduced revenues and earnings because business had slowed and defendants had already converted all of the ratable contracts that could be converted to perpetual contracts to artificially increase revenues in the first and second quarter of 2004 and there were no ratable contracts remaining that could be converted into perpetual contracts in order to maintain the fraud and make the revenue and earnings figures for the third quarter of 2005 appear to meet

---

term licenses produced what the company referred to as "ratable" revenue, which recurred on a monthly basis during the term of the contract. The "term" or "ratable" licenses were typically for 3 years, which meant that the revenue from the contract would be recognized over 12 quarters (4 quarters per year times three years). In contrast, perpetual licenses resulted in what the company referred to as 'immediate' revenue, which was recognized immediately and all at one time.

Amended Compl. ¶ 36.

3

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1  defendants' inflated estimates.

2  Amended Compl. ¶ 33.

3        As to the first four of the above omissions, plaintiffs contend that defendants made numerous

4  statements in their press releases and conference calls that failed to disclose the fact that SupportSoft

5  "faced the same problems and the same difficult market conditions as other software companies." *Id.*

6  at ¶ 31. For example, the amended complaint alleges that an October 16, 2003, press release stated that

7  SupportSoft had delivered "excellent results in spite of difficult market conditions" and touted

8  SupportSoft's "market and technology leadership." *Id.* at ¶ 21. A January 20, 2004, press release

9  described SupportSoft's status as one of "an elite group of companies who have consistently delivered

10 in difficult economic times," and mentioned its "passion for crisp execution." *Id.* at ¶ 23. On April 19,

11 2004, SupportSoft issued a press release stating that it was "executing effectively to satisfy" its

12 customers' needs. *Id.* at ¶ 26. And on July 20, 2004, a SupportSoft press release stated that "[d]espite

13 the difficult environment for enterprise software companies, we continue to grow and outperform the

14 industry." *Id.* at ¶ 28.

15       Plaintiffs contend that these statements were misleading about the true state of business at

16 SupportSoft. In support of this contention, the amended complaint refers to confidential source ("CS")

17 #2, a systems architect from 2000 to mid-2003 "whose job was implementing software packages sold

18 to customers by SupportSoft." *Id.* at ¶ 35. CS #2 stated that "important customers were finding the

19 software to be problematic and incapable of performing functions promised by SupportSoft." *Id.* As

20 an example, CS #2 referred to San Diego County, a SupportSoft customer who complained that "the

21 software was not keeping track of [the number of PCs and the software installed on the customer's

22 network] as promised." *Id.* As a result, CS #2 had to "try to alter the core code of the software to try

23 to get it to perform the promised functions." *Id.* As another example, CS #2 discussed Chase

24 Manhattan, which "purchased SupportSoft software on the representation that it would not only provide

25 help desk support, but would allow Chase Manhattan to deploy new software remotely." *Id.* Again, CS

26 #2 had to spend "hundreds of hours during the latter part of 2002 trying to change the software's core

27

28                                           4

programming because the product could not perform that function." *Id.* CS #2 concluded that "SupportSoft's inability to fulfill the promised performance led to dissatisfaction by such customers as Broadcom, Chase Manhattan and Blue Cross Blue Shield of Chicago and to SupportSoft's loss of contracts." *Id.*

Plaintiffs spend much more time discussing the latter four omissions. The amended complaint uses four confidential sources to support plaintiffs' claim that defendants were "pushing" existing customers into perpetual licenses to increase near-term revenue. The first, CS #1, was Senior Vice President of Worldwide Sales at SupportSoft from March 2001 until the middle of 2003. *Id.* at ¶ 37. In this position, he saw every sale, and reported to Basu and Beattie on a daily basis. *Id.* CS #1 stated that Basu and Beattie were intimately involved in sales, and would determine which deals were taken on a perpetual bases. *Id.* He further stated that, during his tenure, 95% of sales were made on a ratable basis, and that, on average, SupportSoft would only make one or two perpetual deals per quarter. *Id.*

CS #3 worked for SupportSoft from July 1998 to December 2000, and from summer 2002 through October 2003. *Id.* at ¶ 38. When he left the company, CS #3 held the title of Director of Channel Sales, and worked under Tony Rodoni, Vice President of Marketing. *Id.* CS #3 stated that SupportSoft originally offered only ratable licenses, but "over time that changed and more and more contracts were designated as perpetual in order to meet the projected numbers that SupportSoft had given to Wall Street analysts." *Id.*

CS #4 worked at SupportSoft from 1999 until April 2004, holding the title of Sales Director and Director of Business Development at SupportSoft. *Id.* at ¶ 40. In this capacity, he "had direct contact with defendants Basu and Beattie and took direction from them on converting ratable contracts to perpetual contracts when defendants Basu and Beattie wanted to make revenues appear higher." *Id.* According to CS #4, if SupportSoft was "in danger of not meeting its numbers . . . Ms. Basu and Mr. Beattie . . . would direct confidential source no. 4 to go through the pool of existing ratable contracts to look for large contracts that could be converted to perpetual contracts in order to create immediate revenue." *Id.* at ¶ 41. CS #4 would perform this task by selecting a customer, contacting it, and offering

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

it incentives to convert from a ratable into a perpetual contract. *Id.* at ¶ 42. This practice was known within SupportSoft as "eating our young." *Id.* CS #4 alleged that this occurred at least one or twice a quarter and continued into the first two quarters of 2004. *Id.* at ¶ 43. He further identified J.C. Penney and IBM as among the customers who were convinced to convert their ratable licenses to perpetual licenses. *Id.* at ¶ 44.

Finally, CS #5, a certified public accountant, was Corporate Controller of SupportSoft from February 2004 through May 2005. CS #5 stated that Basu and Beattie directed SupportSoft staff to "get ratable contract customers to convert to perpetual contracts in order to appear to meet the revenue projections that the defendants had announced and given to securities analysts." *Id.* at ¶ 51. He also alleged that Basu and Beattie knew that this practice would decrease future earnings and revenues, and discussed this issue at meetings that he attended. *Id.* CS #5 identified a contract for a company named Computer Science as a contract that was converted in the first quarter of 2004. *Id.* at ¶ 52. He also stated that, by the end of the second quarter of 2004, there were no ratable contracts left to convert. *Id.*

Plaintiffs claim that defendants' practices described above constitute securities fraud under § 10(b) and § 20(a) of the Exchange Act. Defendants now bring a motion to dismiss the complaint.

## LEGAL STANDARD

### 1.    Standard for Stating a Claim under the Exchange Act

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 104 S. Ct. 3012 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Even if the face of the pleadings suggests that the chance of recovery is

6

1 remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See*

2 *United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

3    Section 10(b) of the Exchange Act provides, in part, that it is unlawful "to use or employ in

4 connection with the purchase or sale of any security registered on a national securities exchange or any

5 security not so registered, any manipulative or deceptive device or contrivance in contravention of such

6 rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

7    Rule 10b-5 makes it unlawful for any person to use interstate commerce:

8    (a) To employ any device, scheme, or artifice to defraud,

9    (b) To make any untrue statement of a material fact or to omit to state a material fact
10   necessary in order to make the statements made, in the light of the circumstances under
     which they were made, not misleading, or

11   (c) To engage in any act, practice, or course of business which operates or would operate
12   as a fraud or deceit upon any person, in connection with the purchase or sale of any
     security.

13 17 C.F.R. § 240.10b-5

14    In order to state a claim under section 10(b) and Rule 10b-5, the plaintiff must allege (1) a

15 misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff

16 justifiably relied (5) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d 1059,

17 1063 (9th Cir. 1999).

18    "In order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) a primary

19 violation of federal securities law and (2) that the defendant exercised actual power or control over the

20 primary violator." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West*

21 *Holding Co.*, 320 F.3d 920, 945 (9th Cir. 2003). Thus, to state a claim under Section 20(a), plaintiffs

22 must necessarily state a claim under Section 10(b). *See Falkowski v. Imation Corp.*, 309 F.3d 1123 (9th

23 Cir. 2002) (stating that claims under Section 20(a) "are not separate grounds for liability").

24

25 **2.    Pleading Standards**

26    Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or

27

28                                          7

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ.

2  P. 9(b). Rule 9(b) requires that allegations of fraud must be specific enough to give defendants notice

3  of "the particular misconduct which is alleged to constitute the fraud." *Semegen v. Weidner*, 780 F.2d

4  727, 731 (9th Cir. 1985). Federal securities fraud claims, like common law fraud claims, are subject to

5  the special pleading requirements of Rule 9(b). *Id.*

6      The Private Securities Litigation Reform Act of 1995 ("Reform Act") was enacted as an

7  amendment to the Exchange Act. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 n.2 (9th

8  Cir. 1999). Under the Reform Act:

9      In any private action arising under his chapter under which the plaintiff may recover
   money damages only on proof that the defendant acted with a particular state of mind,
10   the complaint shall, with respect to each act or omission alleged to violate this chapter,
   state with particularity facts giving rise to a strong inference that the defendant acted with
11   the required state of mind.

12      15 U.S.C. § 78u-4(b)(2). The required state of mind is "at a minimum, deliberate recklessness."

13  *In re Silicon Graphics*, 183 F.3d at 983.

14

15                          **DISCUSSION**

16      Although the parties' briefs spend a considerable amount of time discussing the particularity of

17  the allegations in plaintiffs' complaint, at oral argument defense counsel reported that defendants'

18  greater concern was whether plaintiffs stated a claim, not whether they satisfied "Rule 9(b) on steroids"

19  -- *i.e.*, the PLSRA.[5]  Specifically, defendants argue that, because they disclosed the increasing trend

20  towards perpetual licenses in their SEC filings, plaintiffs cannot point to any false or misleading

21

22      [5]Defense counsel also acknowledged that plaintiffs' amended complaint contained significantly
23  more detail than plaintiffs' original complaint, and that defendants understood the nature of plaintiffs'
   allegations against them. The Court likewise considers plaintiffs' amended complaint to be a significant
24  improvement over the original complaint, and specifically finds that plaintiffs have provided enough
   detail about their confidential sources to satisfy the Reform Act. *See In re Daou Sys., Inc. Sec. Litig.*,
25  411 F.3d 1006, 1015-16 (9th Cir. 2005).  Given this fact, and the representations made by defense
   counsel, the Court will not require plaintiffs to incur the additional expense and delay of amending the
26  complaint a second time to provide additional particularity. *See Bly-Magee v. California*, 236 F.3d
   1014, 1018 (9th Cir. 2001) ("To comply with Rule 9(b), allegations of fraud must be specific enough
27  to give defendants' notice of the particular misconduct which is alleged to constitute the fraud charged
   so that they can defend against the charge and not just deny that they have done anything wrong.").

28                                8

statements that defendants made.[6]

The Court agrees with defendants, to a point.  There is nothing inherently wrong with SupportSoft's decision to utilize one form of license over another.  This is especially true since defendants repeatedly disclosed that an increasing percentage of their revenue was coming from perpetual licenses. *See* Decl. of Merav Avital-Magen in Support of Def. Mot. ("Magen Decl."), Exhs A-E (SupportSoft SEC filings for 2004 and 2005).  Defendants also informed investors that the increase in perpetual licenses could lead to less predictability in revenue on a quarterly basis:

> As we continue to enter into more perpetual licenses rather than term licenses in the future, we will experience a larger impact on our near-term results of operations and less predictability for future results due to our recognition of all of the license fees as revenue at the time we enter into these perpetual license arrangements rather than our recognition of revenue over the life of a term license.

Magen Decl., Ex. B at 25 (SupportSoft 10-K for 2003, dated March 11, 2004).

The problem with defendants' position, however, is that it miscasts the allegations in plaintiffs' complaint.  Plaintiffs contend that defendants converted ratable licenses into perpetual licenses in a conscious decision to conceal the fact that SupportSoft's business was not performing as well as expected.  Thus, plaintiffs claim that defendants' statements were misleading because they failed to disclose – and, in fact, helped affirmatively disguise – the fact that SupportSoft's business was suffering. This is sufficient to state a claim under the securities laws. *See In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 693 (W.D. Tex. 2001) (even though company's financial results were accurate, complaint stated a claim where company failed to disclose declining sales, departing customers, and similar problems); *see also In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 53 (D. Mass. 2003)

---

[6]Defendants also argue that, because SupportSoft's revenues continued increasing after the third quarter of 2004, the allegations that SupportSoft's business was slowing are "not remotely plausible." Def. Mot. at 17.  The Court finds, however, that SupportSoft's quarterly revenues following the third quarter of 2004 are completely consistent with plaintiffs' accusations.  After falling to $13.5 million in the third quarter of 2004, SupportSoft's revenue rose to $15.1 million, $15.7 million, and $16.9 million over the next three quarters, respectively. *See* Magan Decl. Exhs. H, I, J.  Thus, it took three quarters for SupportSoft to meet the guidance it had announced for the third quarter of 2004.  This is completely consistent with a deteriorating business environment.  Moreover, SupportSoft's revenue for the fourth quarter of 2004 fell again to $13 million. *See* SupportSoft Form 10-Q dated November 11, 2005, *available at* www.sec.gov.  This is another indication that SupportSoft's business was suffering and has never fully recovered.

9

United States District Court
For the Northern District of California

1  (complaint stated a claim where defendant "created a false impression about the current and future

2  profitability" of defendant's product); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*

3  *America West Holding Corp.*, 320 F.3d 920, 932-33 (9th Cir. 2003) (complaint stated a claim where

4  airline's optimistic statements failed to disclose its "continuing maintenance problems, deferral of

5  maintenance costs, ongoing FAA investigation, and settlement negotiations"); *In re Xerox Corp. Sec.*

6  *Litig.*, 165 F. Supp. 2d 208, 217 (D. Conn. 2001) (complaint stated a claim where company touted cost

7  savings from restructuring, but failed to disclose "material negative impact that restructuring had on

8  company's operations and revenue").

9        The strength of plaintiffs' claim, of course, remains to be seen, but that is an analysis for another

10  day.  At present, the only question is one of pleadings, and the Court finds that the pleadings are

11  presently adequate to comply with the standards of the PSLRA and Rule 9(b).

12

13                                    **CONCLUSION**

14        For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants'

15  motion to dismiss (Docket No. 63). Defendants shall file their answers on or before November 30, 2005.

16

17  **IT IS SO ORDERED.**

18

19  Dated: November 19, 2005

20

21                                    SUSAN ILLSTON
22                                    United States District Judge

23

24

25

26

27

28                                    10